**508** CASES IN THE SUPREME COURT

Biscoe et al. vs. Royston et al. [JANUARY

BISCOE ET AL. VS. ROYSTON ET AL.

After the execution of a deed of trust the grantor has no such interest in the trust property as is the subject of sale under execution at law. (*Pettit et al. vs. Johnson et al.*, 15 *Ark.* 55. *Cornish vs. Smith et al. adr.*, 17 *Ib.* )

The purchaser of debts secured by a deed of trust, upon taking an assignment thereof, becomes subrogated to the rights of the *cestui que trust* under the provisions of the deed of trust. (*Hannah ad. vs. Carrington ad.*, 17 *Ark.* )

S. executed a deed of trust to R. upon all his property, consisting of a plantation, negroes, stock, etc., to secure certain debts, the deed provided that the grantor should remain in possession, appropriating the crops, after paying expenses, to the payment of the trust debts; and if they were not paid in five years the trustee might sell; eight years after the execution of the deed, other judgment creditors of S., whose debts were due when the trust deed was made, file their bill to enforce a foreclosure, and a sale of the trust property; it appeared that the trust debts had not been wholly paid, but that the trust property was more than sufficient to pay the balance: *Decreed*, that the property be sold, and after payment of the balance of the trust debts, the proceeds be applied to the payment of the complainants' judgments.

*Appeal from the Circuit Court of Hempstead county in Chancery.*

The Hon. SHELTON WATSON, Circuit Judge.

PIKE & CUMMINS, for the appellants.

A debtor in failing circumstances may prefer one creditor to another; but if he conveys to such creditor a much larger amount of property than is sufficient to secure his debt, postponing the appropriation of it to that purpose for an unreasonable length of time, such conveyance hinders and delays his other creditors, and is void as to them. *Bennett vs. Union Bank*, 5 *Humph.* 612.

And though a conveyance, *valid* in its inception, made for the security of creditors, but becoming, by subsequent events, op-

pressive and injurious to other creditors, will not thereby become *invalid;* yet chancery will interfere to compel an immediate execution of the trust; and after satisfying its purposes, apply the surplus to the payment of other debts. *Pope vs. Wilson,* 7 *Ala.* 690.

The general doctrine on these subjects is settled beyond cavil or dispute.

It is an *utter impossibility* for a debtor to put his property, by deed of trust, in such a condition that he can remain in possession for years, receive the crops and rents, manage and cultivate the property, pay one or two preferred creditors at his leisure, and use as much of the receipts for other purposes as he likes, educating his children, and living in comfort, and at the same preventing his other creditors from subjecting his property to payment of their claims. It is an utter, sheer impossibility. See *Galt vs. Dibbrell,* 10 *Yerger* 146. *Ward vs. Trotter,* 3 *Monr.* 1. *Byrd vs. Bradley,* 2 *B. Monr.* 239. *Lang vs. Lee,* 3 *Rand.* 410. *Garland vs. Rives,* 4 *Ib.* 282. *Van Nest vs. Yoe,* 1 *Sandf. Ch. R.* 4. *Mackie vs. Cairns,* 5 *Cowen* 547. 5 *T. R.* 420. 8 *Ala. Rep.* 104. 9 *id.* 305. 9 *Sm. & Marsh.* 394. 7 *Humph.* 179.

CURRAN & GALLAGHER for the appellees.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

This was a bill to compel the foreclosure of a deed of trust, etc., filed by Henry L. Biscoe and others, Trustees of the Real Estate Bank, under the deed of assignment, against Grandison D. Royston and Robert H. Scott and wife, Sarah, in the Hempstead Circuit Court, etc.

The bill was filed 30th December, 1851.

It sets out and exhibits a deed of trust executed by Scott and wife to Royston as Trustee, bearing date 15th of May, 1843, containing, substantially, the following provisions:

In order to secure the payment of a bond made by Scott to Gasquett, Parish & Co., for $1,557, with ten per cent. interest; and a bond to W. & J. Gasquett & Co. for $6,256 43, same in-

terest; both bonds bearing even date with the deed of trust; and due one day after date; Scott and wife conveyed to Royston as Trustee, certain tracts of land situated in Sevier county, containing together 913 acres and 52-100 of an acre; twenty-one slaves; seven mules; one horse; sixty head of cattle; one hundred and fifty hogs; and all the ploughs, wagons, carts, axes, hoes, and all other tools and implements of husbandry and planting upon the plantation of Scott, made up of the lands aforesaid, upon the following trusts:

If the trust debts, or either of them, or any part thereof, should remain unpaid at the expiration of five years from the date of the deed, Royston, at his own discretion, or upon the request of either of the creditors secured by the deed, was empowered to make public sale of the trust property, or such part thereof as might be required for the payment of the debts, expenses of the trust, etc., and convey the same to the purchasers, etc.

Scott was to remain in possession of the lands, slaves, etc., and cultivate the plantation until the expiration of the five years allowed him for the payment of the debts, and after the year 1843, to deliver up and turn over to Royston the annual crops of cotton, corn and all other products arising from the cultivation of the plantation, after deducting and retaining such part thereof as might be necessary to furnish supplies for, and pay the expenses of the place; and Royston was to sell the crops so turned over to him, and apply the proceeds, less costs and charges of sales, to the payment of the trust debts.

If Scott failed at any time to employ the slaves, etc., in the cultivation of the lands, or turn over the crops as agreed in good faith, Royston was empowered to take possession of the trust property and make sale thereof for the payment of the debts, though the five years allowed by the deed for making payment might not have expired. He was also empowered to sell at any time, on request of Scott, if an advantageous sale could be made, etc., for the purposes of the trust, etc. If the debts were paid by Scott without sale, Royston was to re-convey the property to him, etc.

The bill further alleges that one Thomas B. Haynie, the de-

OF THE STATE OF ARKANSAS. **511**

TERM, 1857.]                    Biscoe et al. vs. Royston et al.

fendant Robert H. Scott, and one Leonard D. Scott, were jointly and severally indebted to the Real Estate Bank, by writing obligatory in the sum of $1,190, bearing interest at ten per cent. from the 15th April, 1841, upon which the Trustees of the Bank obtained judgment in the Hempstead Circuit Court, on the 29th May, 1846, for the debt, interest, etc.

Said Thomas B. Haynie, Robert H. Scott, and one Joseph H. Shaw, were also indebted to the Bank by note due 17th March, 1841, upon which the Trustees obtained judgment, in the Hempstead Circuit Court, against Haynie and Scott, (Shaw having died) on the 6th March, 1849, for $426 87 debt, and $319 00 damages, etc.

Upon the first judgment $69, and upon the second $1, had been made by execution of the property of Haynie. Repeated executions had been issued upon both judgments and returned no property found, and they remained unpaid, etc. Transcripts of the judgments, executions and returns, are exhibited.

That, on the 14th October, 1841, Beamis and Littlefield, surviving partners of the firm of T. W. Beamis & Co., obtained a judgment in the Hempstead Circuit Court against defendant Robert H. Scott, as principal, and Isaac C. Perkins as his security in a forfeited delivery bond for $176 12 debt, etc.

On the 9th of April, 1842, John Sappington recovered a judgment in the same Court against Scott as principal, and Abel B. Clements as security, etc., for $701 80, debt, etc.

In September, 1846, a fi. fa. was issued upon each of the last named judgments to the sheriff of Sevier county, under which the supposed equity of redemption of Scott in all of the trust property was levied upon, sold, and purchased by Royston for a nominal sum, who obtained the sheriff's deed therefor, etc.

That ever since the execution of the deed of trust, Scott had been permitted to remain in the possession, control and enjoyment of the trust property; cultivating the lands with the slaves, etc., making crops, and using and dealing with all of said property as though it were his own. That Royston had made no sale under the provisions of the deed, though the five years al-

lowed by it for the payment of the debts had long since elapsed.
That large sums of money had been annually received by him
from the proceeds of crops made by Scott, amounting to more
than enough to pay the trust debts, but complainants did not
know how he had applied it. That he had permitted Scott to
retain and use large amounts beyond the reservations provided
for in the deed.

That the trust property was worth largely more than the
amount of the debts secured by the deed, and if the debts had
not been paid, a sale should have been made by Royston, long
before the filing of the bill, to pay any balance due upon them.

Complainants submit that after the execution of the trust
deed no interest in the trust property remained in Scott, which
was the subject of execution at law; that Royston acquired no
title by his purchase under the executions in favor of Beamis
& Co. and Sappington, yet he had been paying off their claims
out of proceeds of the trust received by him.

That, notwithstanding said sale under executions and pur-
chase by Royston, the property in fact remained as before, be-
ing still, as was well understood between Royston and Scott,
held by way of mortgage, and charged with said debts to ena-
ble Royston to collect claims put in his hands as an attorney,
in preference to other creditors; and at the same time to allow
Scott to retain possession of the property; and after paying off
the favored debts and defrauding all his other creditors to se-
cure to himself the whole of the property. And complainants
expressly aver that it was distinctly understood between Roys-
ton and Scott that the latter still had the right of redemption
in said property, and should have the same reconveyed to him,
when the debts held by Royston were paid; or if it could be sold
in the mean time, the surplus of proceeds, after paying the
debts, should go to Scott.

That Scott, well understanding himself to be the owner of the
property, had lately advertised it for sale; but had taunted com-
plainants by informing them that they could not reach his pro-
perty; and that unless they would take in full payment of their

debts some worthless lands that once belonged to Haynie, it would be a bad case.

That Scott had produced annually, since the year 1843, upon the trust plantation, at least 100 bales of cotton and 2,000 bushels of corn; and had, or should have paid over to Royston every year, an average sum of $3,000. That, in fact, the trust debts had been paid off, and the deed of trust, and the sheriff's deed were held by Royston for the purpose of shielding the property against other creditors, and especially complainants. That Scott refused to pay any part of complainants' judgment, and relied for protection on the trust and sheriff's deeds as rendering him law-proof. That Royston had known of the existence of complainants' judgments since they were rendered; yet he had neglected to make sale under the trust deed; and holding the deed as a shield between complainants and Scott, continued to receive from the latter such portion of the proceeds of the crops as he chose to pay him, appropriating them as he pleased, and paying therewith claims not embraced in the trust deed, etc. Complainants insist that by placing executions in the hands of the sheriff, etc., they had acquired a prior lien upon the property, and a right to have their claims satisfied out of it in preference to all other creditors except those provided for in the trust deed, etc.

That the trust creditors and Beamis & Co. and Sappington were non-residents, and Royston was the attorney of all of them.

That, as far as complainants knew, Scott had no property but what was covered by the deed of trust. That he embraced his entire property in the deed for the purpose of securing preferred creditors, some of whom were named therein, and others not, and to secure himself the surplus after paying such debts: and so complainants aver that the deed was fraudulent and void in its inception.

The complainants propounded to the defendants thirty-six special interrogatories: the 15th, 16th, 17th and 18th of which were as follows:

" 15. What amounts of corn, cotton and all other products

have been raised and made on said plantation in each year since the year 1843? State particularly and exactly the amounts of each gathered in each year, and the value of each at the proper market, at the time when it was, or could have been sent to market.

" 16. What amounts have been annually, and each particular year since 1843, received and deducted out of said crops by the said Robert H. Scott, and to what particular purposes have the same been applied? Set forth the whole particularly, year by year, and item by item.

" 17. What quantity or amount of cotton, corn and other products has been annually turned over and delivered to said Royston, since 1843, and what amount of money in each year? State the whole particularly, year by year, and item by item.

" 18. How much money has been obtained in each year, or realized by said Royston from the produce so turned over to him? Where did he sell it in each year, and to whom, and when were the proceeds in hand? State the same particularly, year by year, item by item, and shipment by shipment, and exhibit the account of sales of all cotton sold."

Other questions related to the appropriation of moneys received by Royston, the amount paid, and the amount due upon the trust debts, the value of the trust property, etc.

The complainants ask that the bill may be considered as filed on behalf, not only of themselves, but for the benefit of any others of Scott's creditors, who might stand in such attitude as to entitle them to come in thereunder; and pray that by decree, Royston, as trustee in the trust deed, or a commissioner in his stead, might be compelled to sell the trust property, and out of the proceeds of sale pay first any balance that might be due on the trust debts, and then the debts of complainants, and of any other creditor entitled to share with them. That Royston might be compelled to refund, and apply to the payment of the trust debts all moneys received by him from the proceeds of the trust property, and applied by him to the payment of debts not secured by the deed, before resorting to the proceeds of the sale of the property, under the decree, etc.; and for general relief.

Scott and wife filed a joint, and Royston a separate, answer to the bill.

Scott and wife answer substantially as follows:

Gasquett, Parish & Co., and W. & J. Gasquett & Co., recovered judgments in the Hempstead Circuit Court against Scott on debts upon which he had become the security of his son, etc. Executions were issued against him, his property was levied upon, and he was about to be sold out at a sacrifice, and utterly ruined. In order to obtain time upon the debts, and to secure their ultimate payment, he made the bonds recited in the deed, and he and his wife executed and delivered to Royston, the attorney of the plaintiffs in the executions, the deed of trust exhibited with the bill.

They admit that the complainants recovered the judgments against respondent Scott and others, and issued executions thereon, etc., etc., as alleged in the bill; but aver that Haynie was the principal, and Scott merely a security in the debts.

Admit, also, that Beamis & Co. and Sappington obtained judgments, and issued executions thereon against Scott as alleged; and that, on the 10th October, 1846, Royston purchased under these executions, all the title and interest of Scott in the whole of the trust property.

Admit that Scott had been permitted to remain in possession, and control and manage the trust property ever since the execution of the trust deed; but deny that he used and controlled it as his own; on the contrary, they aver that he held it under and subject to the direction of Royston.

Admit that Scott had recently advertised the property for sale, but state that he did it at the request, and as the agent of Royston, and not upon the understanding that it belonged to Scott as alleged in the bill. He had not offered to use or sell any of the property, or the products thereof, without the consent and approbation of Royston; after it was purchased by him under the executions, Scott had not considered that he had any interest in, or control over, the property, other than what he derived from the permission, and by the sufferance of Royston.

Respondents deny that all the property owned by Scott was included in the trust deed, as alleged in the bill; on the contrary, they state that at the time the deed was executed, Scott was the owner of 800 acres of land situated in Hempstead county, which was not embraced in the deed; and which, long after the deed was made, was sold under an execution in favor of the State Bank, and purchased by Royston. That afterwards, in January, 1851, Royston, of his own accord, and as a voluntary kindness to Scott, sold the land, and appropriated the proceeds to the payment of two judgments in favor of Beamis & Co. and Sappington, against Scott, which, by agreement with Royston they received in full satisfaction thereof. That it was in this manner that Royston paid off these judgments, and not out of the proceeds of the trust property as supposed by the bill.

That, about the 1st of May, 1849, Royston, without the knowledge of respondents, purchased of Gasquett, Parish & Co. and W. & J. Gasquett & Co., the debts secured by the deed of trust, and took an assignment thereof. And respondents submit that he, having purchased the interest of Scott in the trust property under the executions, and afterwards paid off and took an assignment of the trust debts, thereby became the absolute owner of the property, as they are advised. Notwithstanding which, Royston, on the 3d of May, 1851, voluntarily, and without obligation or previous agreement so to do, executed and delivered to Scott an instrument of writing, by which, stating the balance due upon the trust debts to be $5,810 31, he agreed that if Scott should well and truly pay said sum with interest, from that date at the rate of eight per cent. per annum, without litigation, hindrance or delay, he would relinquish to him all his right, title and interest in and to the trust property; provided Scott would also pay two notes which were in the hands of Royston for collection, in favor of Smith, Hubbard & Co., one for $330 27, and the other for $249 34, etc., etc.

Respondents further state that Scott had procured from Haynie a conveyance for some lands, which the complainants had once proposed to take from Haynie in full payment of the debts upon which Scott was his security, but had afterwards declined.

That the lands were not worthless, as alleged in the bill, but really of more value than the debts; and that Scott had offered them to complainants in payment thereof, representing his inability to pay otherwise, but not tauntingly as alleged, etc.

That ever since the execution of the deed of trust, Scott had worked and used the trust property for the purpose of liquidating the trust debts: and for supplying and keeping up the plantation. ' He had made corn only for consumption, and none to sell; and sometimes he had to purchase corn to supply the place, with the proceeds of the cotton. The only produce raised on the plantation for sale had been cotton; which was always sent to market as soon as it could be got ready· The crops raised in the years 1843 and 1844 were light, and amounted to very little more, if any, than was required to defray the necessary expenses of the plantation. The crop of 1845, after defraying expenses, paid $1,000 on the trust debts, which was applied 9th of August, 1846. The crop of 1846 paid $2,075 85, July 24th, 1847. The crop of 1847 paid $1,929 28, June 23d, 1848. The crop of 1848 paid $996 29, June 8th, 1849. The crop of 1849 paid $856 91, June 6th, 1850. Out of the crop of 1850 a payment of $984 14 was made 3d May, 1851. No payments had been made on the trust debts other than the above.

Walker & Cheatham held a debt against Scott, in payment of which they offered to take cotton at 12½ cents per pound, when it was not selling for more than ten cents; and the offer being liberal, Scott, with the assent of Royston, let them have about seven bales—this was in 1849 or 1850. With the like consent of Royston, Scott also sold 20 bales of the crop of 1850, to one Black in payment of a debt incurred for supplies for the plantation, clothing for the negroes, overseer's wages, etc. That with the exceptions aforesaid, the proceeds of the sales of all the cotton produced on the plantation since the execution of the trust deed, had been applied to the payment of the trust debts; except what had been appropriated for expenses of the place, and the payment of a few small debts incurred by Scott for the support of his family, and the education of his children. As all his productive property was included in said deed; and

**518**      CASES IN THE SUPREME COURT

Biscoe et al. vs. Royston et al.      [JANUARY

as his only means for making any thing was by raising cotton, it was absolutely necessary for him to use a portion of the proceeds of the crops for the support of his family, and the education of his children; but he had been very economical, and the amounts so applied were inconsiderable.

None of the trust property had been sold; none of the slaves had died, but nine children had been born, and the cattle had also increased, etc., since the execution of the trust deed. The respondents value the whole of the property at the aggregate sum of $18,975 00.

They positively deny that the deed was executed, or was, or had been held by Royston, for the purpose of hindering, delaying or defrauding the creditors of Scott, or for the purpose of enabling Royston to collect claims in his hands as an attorney, other than the trust debts, in preference to other creditors, etc., as alleged in the bill. They aver that no portion of the proceeds of the trust property had been applied to the payment of debts in the hands of Royston for collection, except the trust debts, and that there was no agreement or understanding that such proceeds should be so applied, except as to the debts due to Smith, Hubbard & Co., mentioned in the instrument above referred to.

That Scott owed but very few debts except those held by Royston, and those due to complainants, and none of his other creditors were pressing him. And although he was but the security of Haynie upon the debts due to complainants, he had never attempted to avoid paying them, and still intended to pay them as soon as he possibly could.

If Royston had pressed a sale under the executions in favor of the creditors provided for in the trust deed, the whole of Scott's property, owing to the hardness of the times, would not have sold for half enough to pay the debts; and he, in advanced life, would have been deprived of all means of paying any of his other debts; whereas, by the course adopted, and the indulgence of Royston, he hoped to be able to pay all his debts including those due to complainants. Since the execution of the deed of trust, he had not only been as economical as possible,

but in many instances had denied himself and family of the necessaries and comforts of life; and had managed the trust property to the best advantage, and made every effort in his power to pay his debts.

That, when he settled with Royston on the 3d May, 1851, there was really due upon the trust debts, $6,441 03, but in consideration of his misfortunes, Royston deducted $630 72, and required him to pay but the sum of $5,810 31, as before stated, to obtain a release of the trust property, etc.

The answer was filed May 18th, 1852.

The answer of Royston is substantially the same as that of Scott and wife. As to the amount of the several crops produced by Scott after the execution of the trust deed, the disposition made thereof, the sums paid upon the trust debts, etc., he refers to, and endorses the truth of their answer.

The complainants filed exceptions to both answers, on the grounds that the answer of Scott and wife to the 15th, 16th, 17th and 18th interrogatories propounded to the defendants by the bill, were loose, vague, uncertain and insufficient; and that Royston had made no other answer thereto than by referring to the answer of Scott and wife, etc. The Court overruled the exceptions; and complainants excepted to the decision of the Court.

Complainants filed replications to the answers, and the cause was finally heard upon bill and exhibits; answers and exhibits, and replications; and the Court dismissed the bill for want of equity.

Complainants appealed.

Passing over the question as to the sufficiency of the responses made by the defendants to the interrogatories copied above, we think the complainants were entitled, upon the admissions made by the answers, to relief, and that the Court erred in dismissing the bill for want of equity.

After the execution of the deed of trust, Scott had no such interest in the trust property as was the subject of sale under execution at law; and consequently Royston acquired no title

520        CASES IN THE SUPREME COURT

Biscoe et al. vs. Royston et al.        [JANUARY

to the property by his purchase thereof under the executions in favor of Beamis & Co., and Sappington. See *Pettit et al. vs. Johnson et al.*, 15 *Arh.* 55. *Cornish vs. Smith et al. admrs.*, 17 *Ib.*

When Royston purchased the trust debts, and took an assignment thereof to himself, he thereby became subrogated to the rights of the *cestui que trusts* under the provisions of the deed of trust, and from thenceforward occupied the position of both trustee and *cestui que trust*. See *Hannah adr. vs Carrington adr.*, 17 *Ark. R.*

The admissions of the answers show that Scott's entire estate is covered by the deed of trust. That the balance due to Royston upon the trust debts, 3d May, 1851, was but $5,810 31. That the aggregate value of the trust property was $18,975, over three times the amount due upon the trust debts. That, not only the five years allowed for the payment of the trust debts, by the terms of the deed, had elapsed, but over three additional years had expired before the bill was filed. The aggregate principal of the two debts secured by the deed amounted to $7,813 43, and after the lapse of over eight years with all Scott's efforts and economy to discharge the amount, there remained, it seems, as above stated, still unpaid on the 3d of May, 1851, $5,810 31. At this pace, it would take him a long time to discharge the entire debt.

It may have been very kind in Royston thus to have indulged an unfortunate debtor, but a continuation of such indulgence would be unjust to complainants, whose demands are admitted to have been long due and unpaid. See *Hempstead vs. Johnson et al., ante.*

Upon the allegations of the bill, and the admissions of the answers, the decree of the Court below must be reversed, and the cause remanded, with instructions to the Court to take an account of the balance still due to Royston upon the trust debts, and to decree a foreclosure of the deed of trust and a sale of the trust property, or such portion thereof as may be required, and that the proceeds of sale be first applied to the payment

of the balance due to Royston upon the trust debts, and then to the satisfaction of complainants' judgments, etc. The decree should direct the trustee (Royston) to make the sale, but if he decline to act, a commissioner should be appointed by the Court to act in his stead, etc.